[No. 43026-2-I. Division One. June 21, 1999.]

JIM BULMAN, *Respondent*, v. SAFEWAY, INC., *Appellant*.

*Foster, Pepper & Hefelman*, by *Marco J. Magnano, Jr.*, and *Robin A. Rosencrantz*, for appellant.

*Helsell, Fetterman, Martin, Todd & Hokanson*, by *Andrew J. Kinstler*, for respondent.

ELLINGTON, J. — This case presents one question: What degree of reliance must an employee show in seeking to enforce promises made in an employee handbook? We hold that an employee must prove awareness of the promises allegedly breached, that the employee handbook created an atmosphere of fair treatment and job security, and that the employee relied upon that atmosphere in deciding to stay on the job and not seek employment elsewhere. Because Bulman's evidence satisfied this test, we affirm the jury's verdict.

## Facts

James Bulman began working for Safeway in 1962, gradually working his way into management. He served as the Bellevue district manager for the last 10 years of his

tenure until he was fired in 1995 for violating Safeway's "Employment of Relatives Policy." Bulman was terminated for initiating pay raises for his sons, Jeffrey and Travis, who were employed as helper clerks in stores in his district.

In December 1994, after Jeffrey's pay increases but before Travis was hired, Safeway distributed to its employees an amended version of its Employment of Relatives and Conflict of Interest Policy, prohibiting direct and indirect reporting relationships between relatives. (Prior to the amendment, only direct reporting relationships were prohibited.) The amended policy states that a direct or indirect reporting relationship exists when "a person has the authority to or responsibility for making decisions or influencing decisions affecting another person's employment situation including but not limited to: "performance appraisal[,] . . . rate of pay, [and] merit increase[s.]" The policy further states that if such a reporting relationship or conflict of interest occurs, Safeway "will attempt to find a suitable position to which one of the affected employees may transfer. . . . [Or] the employees will be permitted to determine which one of them will resign."

Bulman conceded bad judgment in initiating the pay raises, although he presented evidence that the store managers where each son worked fully concurred that the pay raises were appropriate. While Bulman contended the policy did not apply to his circumstances, he asserted that in any case, Safeway breached the remedy provisions of the policy.

By way of background, Bulman presented evidence that the real reason for his termination was not initiation of pay raises for his sons, but an earlier disagreement with the Seattle division manager, Robert Diens. In late 1995, Diens and Bulman had a disagreement regarding Bulman's involvement in the rehiring of a former employee. Shortly thereafter, Diens examined Jeffrey's and Travis' personnel files. Diens decided to discharge Bulman after noting that Bulman had initiated the four pay raises for his sons.

Safeway also had a "Performance Management Program"

(PMP), which applied to salaried, non-union employees such as Bulman. Under the PMP, when an employee receives a "4" (needs improvement) or "5" (unsatisfactory) rating, the company institutes a plan to help the employee raise his or her performance to an acceptable level. At a minimum, the plan was required to include specific steps for improvement within a set time frame, regular reviews, and a warning that continued performance at the same level without improvement might result in termination. Bulman received a performance rating of "5" on the day he was terminated.

Bulman sued, claiming wrongful termination resulting from breach of contract and breach of promise to provide specific treatment in specific situations. Safeway moved for summary judgment on both claims. The trial court dismissed the breach of "express" contract claim, but refused to dismiss Bulman's specific treatment claim.

Following a six-day trial, the jury returned a verdict for Bulman, awarding him damages of $906,757.50, including costs and attorney fees. The court denied Safeway's motion for judgment as a matter of law or for a new trial.

Safeway appeals, arguing that the trial court erred in submitting the handbook claim to the jury because as a matter of law, Bulman failed to prove he justifiably relied on any specific promises. Bulman cross appeals dismissal of his contract claim.

## Discussion

### A. Rulings and Record on Review.

At the outset, Safeway asks this court to reverse the trial court's refusal to dismiss Bulman's handbook claim on summary judgment. Safeway acknowledges that if summary judgment were denied because of a factual dispute, the ruling would not be reviewable on appeal. Safeway claims, however, that summary judgment was denied because of a dispute over a substantive legal issue—the standard for reliance required by *Thompson v. St. Regis*

*Paper Co.*[1]—and therefore can be reviewed on appeal. This issue has some importance here because the record on summary judgment contains evidence not presented at trial.

In *Johnson v. Rothstein,*[2] Washington adopted the general rule that a denial of summary judgment cannot be appealed following trial if the denial was based on a determination that material facts remained in dispute. The *Johnson* court declined to decide whether denials of summary judgment based on substantive legal issues should also be covered by this rule.[3] This court resolved the question in *McGovern v. Smith*, holding that denial of summary judgment may be reviewed after entry of final judgment if the decision on summary judgment turned on a substantive legal issue.[4] The Supreme Court has not decisively ruled on the issue; in dicta, it has agreed with *Johnson*, but made no reference to the distinction raised by *McGovern.*[5]

Safeway contends that the substantive legal issue that arose on summary judgment was the distinction between "presumed reliance" and "justifiable reliance," and that the trial court wrongly adopted the theory of presumed reliance articulated by Justice Dore in his dissent in *Stewart v. Chevron Chem. Co.*,[6] rather than the correct standard of justifiable reliance as articulated by *Thompson.*[7] Bulman, on the other hand, claims that "the trial court found issues of fact."

Both Safeway's and Bulman's arguments are speculation. The trial court's order did not explain its denial of summary judgment with respect to the specific treatment

---

[1]102 Wn.2d 219, 685 P.2d 1081 (1984).

[2]52 Wn. App. 303, 304, 759 P.2d 471 (1988).

[3]*Id.* at 305 n.4.

[4]59 Wn. App. 721, 735 n.3, 801 P.2d 250 (1990).

[5]*See Adcox v. Children's Orthopedic Hosp. & Med. Ctr.*, 123 Wn.2d 15, 35 n.9, 864 P.2d 921 (1993).

[6]111 Wn.2d 609, 619, 762 P.2d 1143 (1988) (Dore, J., dissenting).

[7]102 Wn.2d at 230.

claim.[8] There is no transcript of the oral argument or the judge's oral decision (if any) in the record. A review of the motions for summary judgment and reconsideration reveals that neither Bulman nor Safeway mentioned the term "presumed reliance" or Justice Dore's dissent in *Stewart*. Safeway cannot demonstrate that the court's order turned on an issue of substantive law as opposed to an issue of fact. We thus follow the general rule, and disregard any evidence not presented at trial.

## B. Standard of Review

■ An appellate court may overturn a jury's verdict only if the verdict was not supported by substantial evidence.[9] The court may not substitute its judgment for that of the jury as long as there is evidence that, if believed, would support the verdict.[10] The record must contain a sufficient quantity of evidence to persuade a rational, fair-minded person of the truth of the premises in question.[11]

■ Whether an employee handbook contains enforceable promises, and whether those promises were breached, are ordinarily questions of fact.[12] No party alleges error in the court's evidence rulings or jury instructions. Our review therefore is for sufficiency of the evidence to support the verdict.[13]

## C. Justifiable Reliance

The "specific promises" or "handbook" exception to the terminable at will doctrine was first set forth in the

---

[8]The relevant language of the order stated: "Safeway's motion for summary judgment is denied as to wrongful termination (promises of specific treatment in specific circumstances) claims[.]"

[9]*Burnside v. Simpson Paper Co.*, 123 Wn.2d 93, 107-08, 864 P.2d 937 (1994).

[10]*Id.* at 108.

[11]*Id.* at 105-08.

[12]*See Swanson v. Liquid Air Corp.*, 118 Wn.2d 512, 520, 826 P.2d 664 (1992).

[13]*Burnside*, 123 Wn.2d at 107-08.

landmark case of *Thompson v. St. Regis Paper Co.*[14] The *Thompson* court declined to recognize an implied covenant of good faith and fair dealing in every employment contract.[15] The court instead adopted three exceptions to the terminable at will doctrine. First, in the contract modification exception, the court held that statements in employee handbooks may modify the employer's right to terminate at will where the requisites of a contract are satisfied (offer, acceptance, and consideration). Second, "independent of this contract analysis," the court recognized another theory by which "employers may be obliged to act in accordance with policies as announced in handbooks issued to their employees." Third, the court recognized a public policy exception to the doctrine.[16]

It is the second exception at issue here. Finding that the principal purpose of employee handbooks is "to create an atmosphere of fair treatment and job security," and that employers "expect, if not demand, that their employees abide by the policies," the court held:

> This may create an atmosphere where employees *justifiably rely* on the expressed policies and, thus, justifiably expect that the employers will do the same. Once an employer announces a specific policy or practice, especially in light of the fact that he expects employees to abide by the same, the employer may not treat its promises as illusory.
>
> Therefore, we hold that if an employer, for whatever reason, creates an atmosphere of job security and fair treatment with promises *of specific treatment in specific situations* and an employee is induced thereby to remain on the job and not actively seek other employment, those promises are enforceable components of the employment relationship. We believe that by his or her unilateral objective manifestation of intent, the

---

[14]102 Wn.2d 219, 685 P.2d 1081 (1984).

[15]*Id.* at 227.

[16]*Id.* at 233.

employer creates an expectation, and thus an obligation of treatment in accord with those written promises.[17]

 There is no issue raised here as to whether Safeway's promises amounted to specific promises of specific treatment in specific situations; it is conceded they did. Nor is there any challenge on appeal to the jury's determination that such promises were breached. This appeal presents only one question: whether Bulman's evidence was sufficient to support the jury's finding of justifiable reliance. To buttress their respective arguments, Safeway and Bulman rely on differing passages from *Thompson*. Bulman looks to the court's holding:

> [W]e hold that if an employer . . . creates an atmosphere of job security and fair treatment with promises *of specific treatment in specific situations* and an employee is induced thereby to remain on the job and not actively seek other employment, those promises are enforceable components of the employment relationship.[18]

On the other hand, Safeway relies on the three-pronged inquiry delineated by the court in applying its holding to the facts of the case:

> On this record we are unable to determine . . . whether any statements [in the employee manual] amounted to promises of specific treatment in specific situations; if so, whether the appellant justifiably relied on any of those promises; and finally, whether any promises of specific treatment were breached. These questions present material issues of fact.[19]

The two passages relied on by the parties are somewhat inexact with respect to what precisely must be relied upon before an employer's promise is enforceable. Two Supreme Court cases after *Thompson* have discussed this requirement, although neither entirely answers the question posed

[17]*Id.* at 230.

[18]*Id.*

[19]*Id.* at 233.

here. It is clear that, at minimum, an employee must be aware of the policy in question before its breach is actionable. In *Stewart v. Chevron Chemical Co.*,[20] the court found that Stewart could not have relied on the company's layoff policy because he admitted he was unaware of the policy until after he was discharged.

Once an employee is aware of a policy, and his sense of job security is enhanced thereby, he need take no action in reliance on the promise except to remain on the job. In *Swanson v. Liquid Air Corp.*, the court found sufficient evidence of reliance to create an issue of fact regarding the enforceability of the "Work Rights" provision of a "Memorandum of Working Conditions" where the employee presented evidence that company officials discussed the memorandum provisions, the employee believed his employment was governed by the memorandum, and he did not seek other employment because he felt his job was secure.[21]

The question presented here raises two issues not yet directly answered by the Supreme Court. First, how must an employee demonstrate reliance on specific promises? That is, may reliance be shown by proof of awareness of a specific promise, and of an atmosphere of job security and fair treatment derived from an employer's entire body of promises, which atmosphere induces an employee to remain on the job? Or must an employee prove he or she took some specific action because of the particular promise at issue and, if so, must that action be something beyond staying on the job? Second, must the employee know the specific details of a promise before a breach is actionable, or is it sufficient that an employee is generally aware of its nature and terms, in the sense of counting on its enforcement as part of the fair treatment guarantee represented by the entire set of policies?

Interpretations of the reliance requirement by the courts of appeal have varied. In *Siekawitch v. Washington Beef*

---

[20]111 Wn.2d at 614.

[21]118 Wn.2d 512, 525, 826 P.2d 664 (1992).

*Producers, Inc.*, the court held that where the employee testified he knew of the 20 plant rules, believed they applied to him, relied on them, and never looked elsewhere for work, the evidence raised a jury question regarding justifiable reliance.[22] In *Klontz v. Puget Sound Power & Light Co.*, the employee could not demonstrate justifiable reliance after admitting that he "never received any materials . . . that [actually] described the terms and conditions of his employment" and did not become aware of the specific procedures for termination until after he was fired.[23] In *Shaw v. Housing Authority*, the court applied the elements of promissory estoppel to the handbook claim, including the requirement that the promisee change position in reliance on the promise, and held that Shaw presented "no evidence" of reliance.[24] It is unclear from the opinion in *Shaw* what evidence was offered on this point, or what evidence would have been sufficient. The employer had enacted a just cause termination policy that Shaw had drafted and which Shaw alleged was breached. From the court's enumeration of the elements of promissory estoppel, it may be inferred that Shaw failed to show she changed her position in reliance on that particular promise, but the opinion is not clear on this point.[25] Nor does the opinion discuss *Swanson*, with which it appears to be inconsistent.[26]

In *Bott v. Rockwell International*, the court found substantial evidence of reliance where Bott testified he was aware of and relied on four written policies under which he discussed 12 separate violations.[27] In *Wlasiuk v. Whirlpool Corp.*,[28] the court found sufficient evidence of reliance on a promise (unusual in a handbook) that the company would

---

[22]58 Wn. App. 454, 460, 793 P.2d 994 (1990).

[23]90 Wn. App. 186, 191, 951 P.2d 280 (1998).

[24]75 Wn. App. 755, 880 P.2d 1006 (1994).

[25]*Id.* at 760-61.

[26]*See Swanson*, 118 Wn.2d at 525.

[27]80 Wn. App. 326, 908 P.2d 909 (1996).

[28]81 Wn. App. 163, 914 P.2d 102 (1996).

never ask an employee to do anything unethical. The court held that Wlasiuk's pride in being a Whirlpool employee because of the company's commitment to and promises about ethical conduct supported "a rational inference that he was induced by the handbook provisions to remain on the job and not seek other employment."[29] The court also found the verdict supported by evidence of specific action taken in reliance on procedural promises regarding step discipline: "The jury also could have concluded from the evidence that Wlasiuk relied upon the procedural promises of the handbook in choosing his course of action[.]"[30]

These cases reveal no clear line of analysis as to the reliance requirement of *Thompson*.

We reject the proposition that an employee must show he or she undertook some specific course of action because of the policy in question. Such a rule would have absurd consequences, as for example where an employer violated mandatory progressive discipline requirements. An employee should not have to prove that he or she committed a lesser infraction rather than a more serious one because the employee knew that only certain disciplinary steps could be taken. Such evidence would certainly demonstrate reliance, but to require it would have the effect of limiting enforcement of such a promise to cases involving those employees whose conduct is the most deliberate and cynical. An employee who generally relies on the existence of progressive discipline, and who commits a minor infraction without first consulting the handbook to learn what precise disciplinary action is available, would have no recourse in the event the employer ignored its own handbook promise. This is not the result contemplated in *Thompson*, and is rejected by inference in *Swanson*.[31]

We also decline to hold that an employee must show he or she stayed on the job because of the specific promise al-

---

[29]*Id.* at 176.

[30]*Id.*

[31]*See Swanson*, 118 Wn.2d at 525.

legedly breached. This is not a sensible view of the workplace, nor a fair reading of *Thompson*. It is the entire body of promises, represented by the handbook, which creates an atmosphere of job security and fair treatment, and it is that atmosphere, not any single promise, by which the employee is induced to remain on the job. As the court stated in *Thompson*, "[w]e are persuaded that the principal, though not exclusive, reason employers issue such manuals is to create an atmosphere of fair treatment and job security[.]"[32] To suppose that a single promise in a handbook causes the average employee to feel so secure and so confident of fair treatment that he or she does not seek employment elsewhere is to ignore reality.

We hold therefore that reliance may be shown by proof that the employee was aware of the specific promise allegedly breached, and the employer's handbook created an atmosphere of job security and fair treatment derived from the entire body of promises known to the employee, which atmosphere has induced the employee to remain on the job and not seek employment elsewhere.

Turning to the second question, whether the employee must be aware of all details of a promise before its breach is actionable, we find the answer in the same analysis. It is an unrealistic view of the workplace to expect that an employee will commit the contents of an employer's handbook to memory. Nor does *Thompson* so require. The question is whether the employee is aware of the policies allegedly breached. Whether the details of the employer's promises are remembered is relevant, but has no independent status as a requirement. An employee should not be forced to memorize the employer's promises before being able to enforce them if they are breached.

This view is entirely consistent with *Stewart*. First, the handbook provision at issue in *Stewart* was held not to constitute a promise at all, so the court's discussion of reliance is dicta. In any event, the court found no reliance

[32]102 Wn.2d at 229.

where there was "no evidence that Stewart was aware of or relied on the layoff provision,"[33] a fact Stewart conceded in his brief. A complete lack of awareness is incompatible with reliance.

Safeway argues that this interpretation amounts to adopting the theory of "presumed reliance" urged by Justice Dore in his dissent in *Stewart*.[34] We do not, however, authorize any such presumption. An employee must prove personal awareness of a specific policy, as well as reliance on an atmosphere of job security and fair treatment created by the promise at issue in conjunction with any other promises known to the employee. The mere fact that a promise is enunciated will not suffice.

Turning to the facts presented here, we begin by noting again that no party complains of the trial court's instruction, which provided:

> If an employer creates an atmosphere of job security and fair treatment with promises of specific treatment in specific situations, and the employee is induced thereby to remain on the job and not actively seek other employment, those promises are enforceable components of the employment relationship and modify the "at will" nature of the employment.
>
> In order to prevail on this claim the plaintiff must prove:
>
> 1. that the statements in the policy manual amounted to promises of specific treatment in specific situations, and
>
> 2. that the plaintiff justifiably relied on any such promise, and
>
> 3. that the promise of specific treatment was breached.

Two sets of promises were the subject of the parties' evidence at trial. One was the Employment of Relatives Policy, which was part of the Human Resources Management Guide. The 133-page guide was "designed to ensure that our employees are treated fairly, equitably and consistently."

---

[33]*Stewart*, 111 Wn.2d at 614.

[34]*See id.* at 619 (Dore, J., dissenting).

Bulman testified he was "unaware" of the remedy provision of the policy, which is the part of the policy Safeway is alleged to have breached, because "I didn't memorize it." From this testimony Safeway argues Bulman could not, as a matter of law, have justifiably relied on it. The question may be a close one, but Bulman testified he was aware of the policy, it had come across his desk when it was amended, and as a supervisor, he reviewed and implemented Safeway's policies, and believed them to be "fair and just." He testified, "[i]t's one of the reasons that I stayed with the company as long as I did, was the policies and procedures they had were fair, not only to me but to other employees, those that I governed. . . . I managed a thousand people, and . . . it was important to me that what we expected out of them was fair and just." This evidence is enough to support the jury's finding that Bulman justifiably relied. His inability to recite specific details created a fact question for the jury, but is not fatal to his claim.

The other policy before the jury was known as the "Performance Management Program," or PMP. Bulman was also familiar with this policy, in part because as a manager he had used it with his own employees. The program required that where the performance of a nonunion employee such as Bulman falls below Safeway's expectations, a performance improvement plan will be implemented which must include 30 to 90 days to correct problems. Safeway never implemented such a plan for Bulman. Safeway argues the plan did not apply because Bulman was terminated for a specific act in violation of the Employment of Relatives Policy, but the jury may have agreed with Bulman that the relatives policy did not apply, and/or was not the true reason for his termination, and/or that the PMP also applied—especially since, on his termination day, Safeway gave Bulman the lowest possible performance rating (5). This rating triggered the mandatory steps required in the PMP:

> If you receive an overall rating of a 4 or a 5, you will be placed on a Performance Improvement Plan. . . . At a mini-

mum, these Performance Improvement Plans must include the following:

 . . . .

A specific date by which there must be improvement in your performance. As a general rule, these plans may be as short as 30 days or as long as 90 days. . . .

 . . . .

A statement that continuing to perform at this level without improvement will result in further action up to and including termination. . . .

Bulman testified that as a supervisor he had implemented the policy and was familiar with it. His testimony was that Safeway's policies were fair and just and were one of the reasons he stayed with Safeway for 33 years. This evidence supported the jury's conclusion that Bulman justifiably relied upon a promise of specific treatment in specific situations.

## Conclusion

We thus find the evidence sufficient to support the jury's verdict. Given our disposition of this issue, we do not address Bulman's cross appeal. Bulman is awarded costs and fees on appeal under RCW 49.48.030 and RAP 18.1.

Affirmed.

KENNEDY, C.J., and AGID, J., concur.

Reconsideration denied August 26, 1999.

Review granted at 140 Wn.2d 1001 (2000).