27 P.3d 1172 (2001)
144 Wash.2d 335
Jim BULMAN, Respondent,
v.
SAFEWAY, INC., Petitioner.
No. 68670-0.
Supreme Court of Washington, En Banc.
Argued October 24, 2000.
Decided August 2, 2001.
*1173 Jeffrey Lowell Needle, Seattle, WA, Patricia Sue Rose, Seattle, WA, amicus curiae on Behalf of Washington Employment Lawyers Association.
Bryan Patrick Harnetiaux, Spokane, Peterson, Bracelin, Young, Putra & Fletcher, Kelby Dahmer Fletcher, Seattle, Debra Leigh Stephens, Spokane, amicus curiae, on Behalf of Washington State Trial Lawyers Association.
Foster, Pepper & Shefelman, Marco Joseph Magnano, Jr., Robin Alyce Rosencrantz, Seattle, for petitioner.
Helsell, Fetterman, Martin, Todd & Hokanson, Andrew James Kinstler, Seattle, for respondent.
BRIDGE, J.
Safeway, Inc., fired Jim Bulman for initiating wage increases for his two sons while they were working for stores in the district under his management. Bulman sued Safeway for wrongful termination, arguing that the manner of his termination violated Safeway's written personnel policies. He prevailed in a jury trial in King County Superior Court and was awarded damages. Upon appeal, Safeway argued that Bulman was a terminable-at-will employee who had not provided substantial evidence of reliance upon the personnel policies he claimed prevented his termination. The Court of Appeals, Division One, affirmed the jury verdict. Safeway then petitioned for our review. We granted review, and now reverse.

FACTS
The following facts are undisputed. Jim Bulman was the Bellevue district manager for Safeway. He had worked for Safeway from 1962 until his termination in November 1995. He was an at-will employee. Bulman's two sons, both of whom lived with Bulman and contributed to his household expenses, worked for stores in his district as helper clerks. Jeffrey worked for a store in Overlake beginning in September 1992, and Travis for a store in Factoria beginning in March 1995.
*1174 Shortly after their hires, Bulman personally initiated wage increases for his two sons, to the point where both eventually were being paid in excess of the top hourly rates for helper clerks under Safeway's collective bargaining agreement. Both were the highest paid helper clerks in their stores, and were tied for second highest paid among the 156 helper clerks in their father's district. Bulman admitted he had personally initiated exception rates for only two of these 156his sons Jeffrey and Travis.
Bulman was investigated by Safeway's security personnel, suspended on November 20, 1995, and then fired on November 22, 1995. Following his termination, he filed a complaint in King County Superior Court alleging several related causes of action. On May 27, 1997, upon Safeway's motion for summary judgment, Judge Carol Schapira dismissed all claims except Bulman's claim for wrongful termination in violation of Safeway's personnel policies. The jury trial took place before then-Judge Faith Ireland, and Bulman prevailedwinning a total judgment of $906,757.50, including costs and attorney fees. Safeway appealed, and sought our direct review. We remanded to the Court of Appeals, Division One. Bulman cross-appealed, arguing that his claim of an implied employment contract was wrongly dismissed upon summary judgment by the trial court. The Court of Appeals affirmed, and thus did not reach Bulman's cross-appeal.[1] Safeway then petitioned for our review, which we granted. Leave has also been granted to two groups, the Washington State Trial Lawyers Association Foundation and the Washington Employment Lawyers Association, to file amicus briefs in support of Bulman.

ISSUES
(1) Did the Court of Appeals correctly state the standard for justifiable reliance upon an employer's promises of specific treatment in specific situations?
(2) Did Bulman prove justifiable reliance upon promises of specific treatment in specific situations that induced him to remain at Safeway and not seek other employment?
(3) Did either the employment of relatives policy or the personnel improvement plan form the basis of an implied contract?

ANALYSIS

I
The jury found that Bulman was wrongfully discharged, relying upon two Safeway personnel policies: Safeway's performance management program and its employment of relatives policy, both of which Bulman argued applied and did not allow his dismissal. For purposes of this review, Safeway concedes that these two policies contain certain promises of specific treatment in specific circumstances, but argues that Bulman did not establish that he was even aware of them so as to rely upon them. Moreover, Safeway argues that these policies are inapplicable to misconduct.
Generally, employment of indefinite duration may be terminated by either the employer or the employee at any time, with or without cause. Burnside v. Simpson Paper Co., 123 Wash.2d 93, 104, 864 P.2d 937 (1994) (citing Thompson v. St. Regis Paper Co., 102 Wash.2d 219, 223, 685 P.2d 1081 (1984)). Our decision in Thompson v. St. Regis Paper Co. marked the first occasion in which we recognized an exception to the common law terminable-at-will relationship between employer and employee. 102 Wash.2d at 225, 685 P.2d 1081. There we found that this relationship could be contractually modified through an employee policy manual provided by an employer to employees, even where a formal written contract does not exist. Id. at 229, 685 P.2d 1081. We noted, "Once an employer announces a specific policy or practice, especially in light of the fact that he expects employees to abide by the same, the employer may not treat its promises as illusory." Id. at 230, 685 P.2d 1081.
At the threshold, we must address the Court of Appeals' treatment of arguably conflicting language from Thompson. In Thompson, we ruled that an employee seeking to enforce promises that an employer *1175 made in an employee handbook must prove: (1) whether any statements therein amounted to promises of specific treatment in specific situations; (2) if so, whether the employee justifiably relied on any of these promises; and, finally, (3) whether any promises of specific treatment were breached.[2]Id. at 233, 685 P.2d 1081. Safeway alleges that Bulman never proved the second prong of that test. We have written that "[a]n employer is bound only by promises upon which the employee justifiably relied."[3]Stewart v. Chevron Chem. Co., 111 Wash.2d 609, 614, 762 P.2d 1143 (1988) (emphasis added) (citing Thompson, 102 Wash.2d at 233, 685 P.2d 1081). Thus, we have held that, as a matter of law, there is not an enforceable promise of specific treatment in specific circumstances "where the employee did not know about the `promise' until after he was discharged."[4]Swanson v. Liquid Air Corp., 118 Wash.2d 512, 522, 826 P.2d 664 (1992) (citing Stewart, 111 Wash.2d 609, 762 P.2d 1143). Such a promise could not have been justifiably relied upon. Id.
Bulman, and the dissent, seek to reduce the Thompson test to generalities. They rely upon language in Thompson that is somewhat ambiguous. There we had written generally of employee manuals as follows: "We are persuaded that the principal, though not exclusive, reason employers issue such manuals is to create an atmosphere of fair treatment and job security for their employees." Thompson, 102 Wash.2d at 229, 685 P.2d 1081 (citing Parker v. United Airlines, Inc., 32 Wash.App. 722, 726-27, 649 P.2d 181 (1982)). Expanding upon this theme later in the opinion, we held, "[I]f an employer, for whatever reason, creates an atmosphere of job security and fair treatment with promises of specific treatment in specific situations and an employee is induced thereby to remain on the job and not actively seek other employment, those promises are enforceable components of the employment relationship." Id. at 230, 685 P.2d 1081. Unfortunately, this somewhat imprecise holding has created uncertainty in interpreting Thompson. The Court of Appeals in this case correctly noted that unanswered by Thompson was the question of how an employee must demonstrate reliance upon a specific promise. Bulman, 96 Wash.App. at 202, 978 P.2d 568.
The Court of Appeals then summarized varying interpretations of the reliance requirement in Thompson from five other decisions of divisions of the Court of Appeals. See id. at 202-04, 978 P.2d 568 (discussing Siekawitch v. Wash. Beef Producers, Inc., 58 Wash.App. 454, 793 P.2d 994 (1990); Klontz v. Puget Sound Power & Light Co., 90 Wash. App. 186, 951 P.2d 280 (1998); Shaw v. Housing Auth. of Walla Walla, 75 Wash. App. 755, 880 P.2d 1006 (1994); Bott v. Rockwell Int'l, 80 Wash.App. 326, 908 P.2d 909 (1996); Wlasiuk v. Whirlpool Corp., 81 Wash.App. 163, 914 P.2d 102 (1996)). It found that "[t]hese cases reveal no clear line of analysis as to the reliance requirement of *1176 Thompson." 96 Wash.App. at 204, 978 P.2d 568. The court then adopted its own test:
We hold ... that reliance may be shown by proof that the employee was aware of the specific promise allegedly breached, and the employer's handbook created an atmosphere of job security and fair treatment derived from the entire body of promises known to the employee, which atmosphere has induced the employee to remain on the job and not seek employment elsewhere.
Id. at 205, 978 P.2d 568 (emphasis added). Not only is this "atmospheric" test an overly broad interpretation of Thompson, it also clearly conflicts with a jury instruction in this case. This test is also incongruent with other language in the Court of Appeals' opinion, wherein it stated, "An employee must prove personal awareness of a specific policy.... The mere fact that a promise is enunciated will not suffice." Id. at 206, 978 P.2d 568 (emphasis added).
One must logically read the more general holding in Thompson in conjunction with the later three-part test in that opinion applying that holding. Otherwise, one might ask whether the employee's reliance is induced by the employer's promises or by the atmosphere of job security created by those promises. The Court of Appeals obviously resolves this question in favor of the latter interpretation. However, even the more general language, with its original italicized emphasis on "promises of specific treatment in specific situations," makes it quite clear that it is not enough for a plaintiff in a wrongful discharge case to simply be able to rely upon the general atmosphere of his or her work place as the inducement for remaining on the job and not seeking other employment. Thompson, 102 Wash.2d at 230, 685 P.2d 1081. The promises, after all, are not to be forgotten after giving rise to "an atmosphere of job security and fair treatment," for it is very specific promises that create such an atmospherethe atmosphere itself does not create promises. Id.
In addition to the three-part test that follows it, the holding in Thompson is preceded by language that sheds light on its reference to a work place's atmosphere. Of employment manuals, we wrote, "It would appear that employers expect, if not demand, that their employees abide by the policies expressed in such manuals. This may create an atmosphere where employees justifiably rely on the expressed policies and, thus, justifiably expect that the employers will do the same." Thompson, 102 Wash.2d at 230, 685 P.2d 1081. How an employee can abide by, let alone justifiably rely upon, policies of which he or she is unaware is a mystery that the Court of Appeals and the dissent here cannot explain.
In Swanson v. Liquid Air Corp., we applied the holding from Thompson and put it into proper context by focusing upon whether the employer "made a promise of specific treatment in specific circumstances inducing plaintiff to stay on the job and not seek other employment." 118 Wash.2d at 525, 826 P.2d 664 (citing Thompson, 102 Wash.2d at 230, 685 P.2d 1081). In other words, our concern was whether a promise, not the atmosphere created by such promises, induced an employee to remain in a job. We embraced the three-part test of Thompson as the means to measure "whether statements in employee manuals, handbooks, or other documents amount to promises of specific treatment in specific situations, whether plaintiff justifiably relied upon any such promises, and whether any such promise was breached." Id. (emphasis added) (citing Thompson, 102 Wash.2d at 233, 685 P.2d 1081). However, in Swanson, unlike this case, the plaintiff "presented sufficient evidence to take these questions to the trier of fact." Id.
Like Swanson, an instruction given the jury in this case, instruction number 8, appropriately harmonizes both the general and specific components of our ruling in Thompson:
If an employer creates an atmosphere of job security and fair treatment with promises of specific treatment in specific situations, and the employee is induced thereby to remain on the job and not actively seek other employment, those promises are enforceable components of the employment relationship and modify the "at will" nature of the employment.

*1177 In order to prevail on this claim the plaintiff must prove:
1. that the statements in the policy manual amounted to promises of specific treatment in specific situations, and
2. that the plaintiff justifiably relied upon any such promise, and
3. that the promise of specific treatment was breached.
If you find that the plaintiff has proved each of the above propositions by a preponderance of the evidence then your verdict should be for the plaintiff. If the plaintiff fails to prove any of the above propositions then your verdict should be for the defendant.
Clerk's Papers (CP) at 701 (emphasis added).
In sum, the Court of Appeals' formulation of a justifiable reliance test based upon a work place's "atmosphere" is at odds with Thompson and its progeny, and is clearly at odds with the jury instruction in this case. The jury instruction correctly captures the standard for proving one's case under Thompson. To find otherwise would be to allow the Thompson exception to swallow the terminable-at-will rulea result this court never intended.

II
Bulman's wrongful termination claim was argued on the theory that his termination violated Safeway's employment of relatives policy and a provision of its performance management program. In Burnside v. Simpson Paper Co., we wrote, "Overturning a jury verdict is appropriate only when it is clearly unsupported by substantial evidence." 123 Wash.2d at 107-08, 864 P.2d 937 (emphasis added). Bulman offered no substantial evidence at trial to support a finding that he justifiably relied upon either of the personnel policies in question here.
The employment of relatives policy (found within the company's human resources management guide) in effect at the time of Bulman's discharge had been revised in December 1994less than a year before his termination. It read, in relevant part:
Relatives of Safeway employees may work anywhere in the Company, provided employment does not:
 Create either a direct or indirect reporting relationship with an immediate family member; or
 Create either an actual conflict of interest or appearance of a conflict of interest. These criteria will also be considered when assigning, transferring, or promoting an employee.
. . .
Should one of the above situations occur, the Company will attempt to find a suitable position to which one of the affected employees may transfer. If accommodations of this nature are not feasible, the employees will be permitted to determine which of them will resign.
Clerk's Papers (CP) at 164.
Prior to the change, relatives of Safeway employees were allowed to work anywhere in the company provided they did not report directly to a relative. The remedial language was not present. CP at 163. Under cross-examination, Bulman testified that he was not aware of the change at the time it was made, and admitted that he first became aware of it the night that he was suspended from his job after a meeting with Safeway security personnel. Report of Proceedings (RP) (July 11, 1997) at 69. In response to the question of whether that was the first time he was aware that if there were a problem under the policy the affected employees could either transfer or resign, Bulman responded, "Yes." Id. He only ambiguously qualified those admissions in the following exchange:
Q. So Mr. Bulman, it wasn't until November 20th, 1995 that you were aware of the remedy articulated in this policy; isn't that correct?
A. Correct, as I hadn't memorized it.
Id. at 70.
Bulman admitted that the policy did not cover a termination for alleged favoritism and conflict of interest in initiating wage increases for relatives. When asked whether he even had a copy of the guide in which the policy appeared, he responded, "It would've *1178 been probably in myone of my file cabinets." Id. at 73. Asked whether he periodically used the guide, he responded, "No." Id. Asked to elaborate as to why he did not, he responded, "I had no reason to. I mean, if there's a question that I wanted an answer to, I would've asked Darlene and she would go get me an answer, but for me to sit down and thumb through it, I was fortunate in having Darlene." Id. However, even assuming that she had the requisite understanding, "Darlene" is not the one suing upon a claim of having justifiably relied upon Safeway's employment of relatives policy.[5] Even in response to questions from his own attorney, Bulman came no closer to saying he had actually read the policy:
Q. I take it on November 20, 1995 you developed a new understanding of the employment of relatives and conflict of interest policy?
A. Yes, I did.
Q. Do you have an opinion as to whether it had ever crossed your desk prior to that time?
A. It had, but again, you know, I can't remember emphatically that it happened on X day and I read it at this time. Again, it was just one of thoseI didn't memorize and lock into my memory.
Id. at 76. Yet the Court of Appeals, although declaring it a "close" question, determined that Bulman's testimony was that "he was aware of the policy" and that, accordingly, he justifiably relied upon it. Bulman, 96 Wash.App. at 207, 978 P.2d 568. Ignoring the unequivocal admissions that precede it, the court seizes upon his gratuitous statement that he "hadn't memorized" the policy as being an indication that he remembered it but was simply unable "to recite specific details." Id.
The other policy before the jury was contained within Safeway's performance management program (PMP), which required that where a salaried nonunion employee such as Bulman received an overall rating on a scale of 1 to 5 (with 1 being "sterling" and 5 being "unsatisfactory") of a 4 or a 5, a performance improvement plan (PIP) would be implemented. Pet. for Review, App.; RP (July 10, 1997) at 81. The purpose of the plan would be to help improve the employee's performance to an acceptable level (defined as a 3 rating or better). The PIP would allow for a period of improvement prior to termination, generally over the course of 30 to 90 days. On a personnel data form dated the day that Bulman was fired, under a section headed "Termination Information," Bulman was given a 5 rating. See Pet. for Review, App. Bulman had already been suspended for misconduct prior to that rating, and had removed his personal effects from his office. Safeway's policies require that this section of the personnel data form "be completed in full" in reporting an employee's termination and requires the form to be submitted to the human resources department after that termination. CP at 248. Safeway notes, "Safeway's completion of the Data Form 1 was not part of an evaluation process and did not trigger a PIP because Bulman had already been discharged." Pet. for Review at 10 (emphasis added). Moreover, even in response to questions from his own attorney Bulman did not provide substantial evidence to support the claim that he justifiably relied upon the PIP policy:
Q. Can you identify that document for me?
A. Performance management program.
. . .
Q. Have you seen that document before?
A. Probably have, yes.
Q. Are you familiar with Safeway's performance management program for employees?
A. Yes, with respect to rating scales and doing evaluations, yes.
RP (July 9, 1997) at 36 (emphasis added). In other words, Bulman, even after trial preparation, could only say that he had "probably" seen the PMP document before, and was familiar with a component of it, but did not *1179 demonstrate any familiarity with the PIP provision.
From the foregoing testimony the Court of Appeals drew the remarkable conclusion that Bulman had "testified that as a supervisor he had implemented the policy and was familiar with it." Bulman, 96 Wash.App. at 208, 978 P.2d 568. But then, in a passage that reveals what the court found to be truly significant in light of the amorphous "atmospheric" reliance test it had adopted, the court continues, "His testimony was that Safeway's policies were fair and just and were one of the reasons he stayed with Safeway for 33 years."[6]Id. Then the court comes full circle, "This evidence supported the jury's conclusion that Bulman justifiably relied upon a promise of specific treatment in specific situations." Id. (emphasis added).
With respect to both policies, then, the Court of Appeals essentially adopted the presumed reliance standard that the dissent in Stewart had advocated. There Justice Dore wrote, "Employee awareness of a specific handbook provision is not a prerequisite to the enforceability of the provision." Stewart, 111 Wash.2d at 619, 762 P.2d 1143 (Dore, J., dissenting). He stated, "[I]t does not matter that the employee knows nothing of the particulars of the employer's policies. Where an employer creates an atmosphere of fair treatment and job security reliance is presumed." Id. (citations omitted). The Court of Appeals denied that it was adopting this standard. Bulman, 96 Wash.App. at 206, 978 P.2d 568. Yet, the court strayed far afield from the three-part Thompson test by "reject[ing] the proposition that an employee must show [that] he or she undertook some specific course of action because of the policy in question," and also by declining "to hold that an employee must show he or she stayed on the job because of the specific promise allegedly breached." Id. at 204-05, 978 P.2d 568. Nor would the court require that an employee remember any details of his or her employer's promises, seeming to tailor its analysis to Bulman's testimony by writing, "It is an unrealistic view of the workplace to expect that an employee will commit the contents of an employer's handbook to memory." Id. at 205, 978 P.2d 568. However, one could not fairly ascribe this view to Safeway.[7]
In sum, the jury verdict of wrongful discharge in this case was clearly unsupported by substantial evidence that Bulman justifiably relied upon the two personnel policies in question. Burnside, 123 Wash.2d at 107-08, 864 P.2d 937. They could hardly have induced him "to stay on the job and not seek other employment" given that he clearly failed to demonstrate any pretermination familiarity with the "promises of specific treatment in specific situations" he alleges were contained therein. Swanson, 118 Wash.2d at 525, 826 P.2d 664 (citing Thompson, 102 Wash.2d at 230, 685 P.2d 1081).

III
In light of our reversal of the Court of Appeals on the reliance issue, it is necessary *1180 to address Bulman's cross-appeal of the trial court's pretrial dismissal, upon summary judgment, of his implied contract claim. Because it affirmed the trial court, the Court of Appeals did not have to reach this cross-appeal. Bulman, 96 Wash.App. at 208, 978 P.2d 568. Bulman correctly notes that where an implied employment contract exists reliance upon its terms is irrelevant. See DePhillips v. Zolt Constr. Co., 136 Wash.2d 26, 36, 959 P.2d 1104 (1998) (noting that the justifiable reliance element from the three-part Thompson test "takes the claim out of the traditional contract realm"). Accordingly, because the personnel improvement plan and the employment of relatives program were binding upon Safeway, Bulman argues that the jury verdict can be affirmed on the alternative theory that these policies formed an implied employment contract preventing his dismissal.
In reviewing a grant of summary judgment, we engage in the same inquiry as the trial court. Swanson, 118 Wash.2d at 518, 826 P.2d 664 (citing Marincovich v. Tarabochia, 114 Wash.2d 271, 274, 787 P.2d 562 (1990)). Summary judgment is appropriate where our review of all evidence shows that there is no genuine issue as to any material fact and the moving party is entitled to a judgment as a matter of law. Id. (citing CR 56(c); Marincovich, 114 Wash.2d at 274, 787 P.2d 562). Facts and all reasonable inferences therefrom are considered in the light most favorable to the nonmoving party, and summary judgment will be upheld only where, from all the evidence, we find that reasonable minds could have reached but one conclusion. Id. (citing Marincovich, 114 Wash.2d at 274, 787 P.2d 562). In interpreting the language of employment policies, "if reasonable minds cannot differ as to whether language sufficiently constitutes an offer or a promise of specific treatment in specific circumstances, as a matter of law the claimed promise cannot be part of the employment relationship." Id. at 522, 826 P.2d 664 (citing Stewart, 111 Wash.2d 609, 762 P.2d 1143).
In Thompson we firmly rejected the invitation to adopt an exception to the employment at will doctrine that would read into every employment contract "an implied covenant of good faith and fair dealing which limits the employer's discretion to terminate an at will employee." Thompson, 102 Wash.2d at 224, 227, 685 P.2d 1081. However, we did find that an employment relationship of indefinite duration that would generally be terminable at will "is terminable by the employer only for cause if (1) there is an implied agreement to that effect or (2) the employee gives consideration in addition to the contemplated service." Thompson, 102 Wash.2d at 223, 685 P.2d 1081 (citing Roberts v. ARCO, 88 Wash.2d 887, 894, 568 P.2d 764 (1977)).
In determining whether an implied contract to terminate only for cause exists
"the requisites of contract formation, offer, acceptance and consideration are necessary predicates to establishing that policies in an employment manual are part of the employees' original employment contract or part of the employment contract as modified by the parties."
Swanson, 118 Wash.2d at 523, 826 P.2d 664 (quoting Thompson, 102 Wash.2d at 228, 685 P.2d 1081). In Thompson, after reviewing the employee policy manual at issue and the entire record, we found no implied contract that the discharged employee was to be discharged only for cause. Thompson, 102 Wash.2d at 224, 685 P.2d 1081. We noted that the discharged employee's subjective understanding that he would be discharged only for cause was insufficient to establish an implied contract to that effect. Id. (citing Lasser v. Grunbaum Bros. Furniture Co., 46 Wash.2d 408, 413, 281 P.2d 832 (1955); Roberts, 88 Wash.2d 887, 568 P.2d 764). Similarly, in Stewart the facts led to our conclusion that no contract could exist at all in the absence of a sufficiently specific contractual promise. Swanson, 118 Wash.2d at 522, 826 P.2d 664 (citing Stewart, 111 Wash.2d 609, 762 P.2d 1143).
Not only does Safeway argue that Bulman could not have justifiably relied upon the employment of relatives policy and the personnel improvement plan, it argues thatas a matter of contract lawthey were inapplicable to the facts compelling his termination and could not reasonably have been found to have been breached under the facts of Bulman's termination. We agree with Safeway.
*1181 The employment of relatives policy, for example, was obviously designed to prevent the very conflict of interestBulman's two sons working in the district that he managedthat was compounded by the misconduct of Bulman initiating wage increases for his sons. As for the personnel improvement plan provision, on its face it was designed to remedy an employee's subpar job performance, not a determination of outright misconduct. It was inapplicable under these circumstances. To find otherwise and conflate the misconduct of initiating pay increases for one's own sons with job performance concerns would be, as Safeway notes, to suggest that Safeway could not dismiss employees outright for theft or assault. Furthermore, the finding of misconduct that Bulman was fired for had already resulted in his suspension two days prior to his receiving an unsatisfactory rating on the personnel form reporting his termination. Whatever one's feelings on redemption might be, in the work place context an employee's firing precludes that employee's rehabilitation or "personnel improvement" in the job from which he has been fired.
One must give these policies a reasonable construction. In Baldwin v. Sisters of Providence in Washington, Inc., 112 Wash.2d 127, 769 P.2d 298 (1989), we quoted approvingly from an Oregon Supreme Court opinion addressing a dispute over an employee handbook provision:
"[T]here is a just cause provision, but no express provision transferring authority to make factual determinations from the employer to another arbiter. Neither is there reason to infer that such a meaning was intended by the terms of the Employee Handbook.... [The handbook] is a unilateral statement by the employer of self-imposed limitations upon its prerogatives.... [T]he meaning intended by the drafter, the employer, is controlling and there is no reason to infer that the employer intended to surrender its power to determine whether facts constituting cause for termination exist.... In the absence of evidence of express or implied agreement whereby the employer contracted away its fact-finding prerogative to some other arbiter, we shall not infer it."
Id. at 137-38, 769 P.2d 298 (alternations in original) (emphasis added) (quoting Simpson v. W. Graphics Corp., 293 Or. 96, 100-01, 643 P.2d 1276 (1982)).
Here there is no evidence that Safeway intended, through adoption of either the employment of relatives policy or the personnel improvement plan provision, to surrender its power to determine whether an employee's misconduct warranted his or her termination. Even considering the record in the light most favorable to Bulman, reasonable minds could have reached but one conclusion: These two policies did not constitute an implied contract that precluded Bulman's termination under the circumstances in this case. Summary judgment on this issue was appropriate, and Bulman's cross-appeal is without merit.

CONCLUSION
Where the employment relationship is of indefinite duration, it is generally terminable-at-will. However, employees are entitled to justifiably rely upon promises of specific treatment in specific situations contained within an employee handbook, and the breach of such promises may preclude their termination. The Court of Appeals incorrectly stated the standard for an employee's justifiable reliance upon such promises. At a minimum, employees seeking to enforce such promises must have been aware of them prior to the termination of their employment. It is clear that Bulman offered no substantial evidence that he possessed the necessary awareness of the two policies that he claims precluded his termination. Without that awareness, he could not have justifiably relied upon those policies; they could not have acted as an inducement for him to stay at Safeway and not seek employment elsewhere prior to his termination. We, therefore, reverse the Court of Appeals' and the trial court's judgment. Furthermore, Bulman's cross-appeal arguing that the trial court erred in dismissing his breach of an implied contract claim is unavailing because the two policies in question could not have formed the basis of an implied contract precluding *1182 his termination. Accordingly, his cross-appeal is denied.
ALEXANDER, C.J., MADSEN, J., and GUY and COX, JJ. Pro Tem., concur.
JOHNSON, J. (dissenting)
The majority's opinion is a significant retreat from what we established in Thompson v. St. Regis Paper Co., 102 Wash.2d 219, 685 P.2d 1081 (1984). In Thompson, we found it necessary to modify the common law employment at-will doctrine in order to rectify the employer's "unfettered control of the workplace" which left employees largely unprotected from changing work conditions. Thompson, 102 Wash.2d at 226, 685 P.2d 1081. In this case, the majority retreats from what was recognized in Thompson by placing unreasonable and impractical burdens on employees. To reach that result, the majority rather remarkably overturns a jury determination not based on an erroneous jury instruction but based on the majority's own ad hoc review of the evidence. The jury's verdict should be affirmed here because there is sufficient evidence to support the jury's finding that Jim Bulman justifiably relied on Safeway's "promises of specific treatment in specific situations." Thompson, 102 Wash.2d at 230, 685 P.2d 1081.
In Thompson, we ruled that an employee seeking to enforce promises an employer made in an employee handbook must prove: (1) whether any statements therein amounted to promises of specific treatment in specific situations; (2) if so, whether the employee justifiably relied on any of these promises; and finally (3) whether any promises of specific treatment were breached. Thompson, 102 Wash.2d at 233, 685 P.2d 1081. Here, there is no question Safeway made statements amounting to promises of specific treatment in specific situations. Likewise, there is no question these promises were breached. The only issue here is whether Bulman justifiably relied on these promises. To properly analyze this question, it is necessary to look at the context in which the above stated test was formulated and the historical inequities Thompson addressed.
In Thompson, we held an employer could modify a terminable at-will relationship and contractually obligate itself to the provisions found in an employee policy manual. Primarily concerned with the unequal power between employees and employers that existed under the common law termination at-will doctrine, we explained:
When the employment relationship is not evidenced by a written contract and is indefinite in duration, the parties have entered into a contract whereby the employer is essentially obligated to only pay the employee for any work performed. In this contractual relationship, the employer exercises substantial control over both the working relationship and his employees by retaining independent control of the work relationship. Thus, the employer can define the work relationship. Once an employer takes action, for whatever reasons, an employee must either accept those changes, quit, or be discharged. Because the employer retains this control over the employment relationship, unilateral acts of the employer are binding on his employees and both parties should understand this rule.
Thompson, 102 Wash.2d at 229, 685 P.2d 1081. We went on to explain that once an employer voluntarily issues a manual promising "specific treatment in specific situations" and makes this known to its employees, the employment relationship is changed. Thompson, 102 Wash.2d at 230, 685 P.2d 1081. By issuing the manual, the employer has created an atmosphere of job security and fair treatment inducing the employee to continue the employment relationship. Thompson, 102 Wash.2d at 230, 685 P.2d 1081.
In an at-will work relationship, it is the employer who has the power to unilaterally change the conditions of that relationship, presumably for its own gain. Once it issues an employee handbook, the employer demands its employees abide by the policies in it. In exchange for its promises of specific treatment in specific circumstances, the employer secures a cooperative and loyal work force. In contrast, the at-will employee is powerless to initiate a modification of the *1183 employee relationship. Once a manual has been issued, the employee has only two choices stay and accept the new conditions of the employment relationship or terminate the relationship. This is why, under Thompson, we scrutinize the employer's actions more closely than those of the employee. Thompson, 102 Wash.2d at 229-30, 685 P.2d 1081.
Without saying so, the majority in this case significantly departs from Thompson by imposing a much higher standard for employees to prove justifiable reliance. However, as was considered in Thompson, justifiable reliance is a more generalized concept. It focuses on the employee's reliance that the atmosphere of fair treatment created by the employer's voluntary issuance of the manual will be adhered to by the employer. Our cases do not suggest an employee must be specifically aware of the details of the particular promises contained in the manual. Specificity is discussed in the context of the employer's promises. It is the employer who makes specific promises for specific treatment in specific circumstances to unilaterally change the work environment. The employee accepts these changes by relying on the fair atmosphere created by these promises as a basis for staying with the employer.
Recognizing this imbalance of control over the work relationship, we do not impose a significant degree of specificity on behalf of the employee. Once the employer has offered the employee the new employment conditions as memorialized in the handbook, all that is required of the employee to accept this offer is that he or she is aware of the policy and remains on the job. This is the essence of justifiable reliance as it was conceptualized in Thompson and this is how the jury was instructed in this case. Yet, the majority criticizes this as "overly broad," instead, introducing a new standard that requires the employee prove he or she was specifically aware of the specific promise that was breached. Majority at 1175-76.
To justify the imposition of this new standard, the majority takes a myopic approach to our cases, leading it far astray from the principles established in Thompson. One example of this is the majority's misrepresentation of our analysis in Swanson v. Liquid Air Corp., 118 Wash.2d 512, 826 P.2d 664 (1992). In an attempt to discount the Court of Appeals' "atmospheric" approach in this case, the majority points to Swanson for the proposition that we endorse the three-part test, rejecting any connection between the atmosphere of fair treatment created by a handbook and the element of justifiable reliance. This is a contorted reading of Swanson.
Swanson actually reaffirmed the principles of Thompson, including work place atmosphere. We explained that employers, by issuing an employee manual, "create an atmosphere where employees justifiably rely on those expressed policies and justifiably expect that the employer will abide by those same policies." Swanson, 118 Wash.2d at 520, 826 P.2d 664 (citing Thompson, 102 Wash.2d at 230, 685 P.2d 1081). Significantly, and what the majority ignores, we then went on to quote Thompson's holding:
"if an employer, for whatever reason, creates an atmosphere of job security and fair treatment with promises of specific treatment in specific situations and an employee is induced thereby to remain on the job and not actively seek other employment, those promises are enforceable components of the employment relationship."
Swanson, 118 Wash.2d at 520, 826 P.2d 664 (quoting Thompson, 102 Wash.2d at 230, 685 P.2d 1081). It is quite clear by our reaffirmation of Thompson in Swanson that we considered an employee's justifiable reliance the product of the atmosphere of fair treatment created by the issuance of an employee manual. Justifiable reliance must be considered in relation to the work place environment, not in relation to the specific promises made by the employer. Yet, the majority artificially isolates the concept of justifiable reliance from the context in which we considered it in both Thompson and Swanson in order to reach the result it wants in this case.
The majority also attempts to find support for its position in Stewart v. Chevron Chemical Co., 111 Wash.2d 609, 762 P.2d 1143 (1988). In Stewart, we looked at Chevron's policy manual regarding the sequencing of layoffs. We determined the language of the policy did not amount to a specific promise. Thus, Stewart's claim failed because Chevron *1184 had never modified the at-will employment relationship. This alone distinguishes Stewart from our case. Yet, the majority focuses on the single paragraph in the opinion where the court ostensibly addressed the concept of justifiable reliance. In that paragraph, the court stated Stewart had also failed to show justifiable reliance because he was not aware of the company's layoff policy until after he was discharged. See Stewart, 111 Wash.2d at 614, 762 P.2d 1143.
The issue of justifiable reliance was not central to our holding in Stewart. We did not need to reach that issue when we had already determined Chevron never made any specific promises. Consequently, we undertook no meaningful analysis of whether Stewart justifiably relied on the specific promises made by Chevron. Our comment in Stewart regarding justifiable reliance offers no guidance in this case. The principles of Thompson should guide our analysis here.
Under Thompson, justifiable reliance is evidenced by an employee's continued employment after the employee has become aware the employer has issued a manual containing specific promises of specific treatment in specific circumstances. The employee need not prove he or she read in detail and can recall the specific promises contained in an employee handbook. Under Thompson, it is enough that the employee is aware of these specific promises and chooses to stay in the employment relationship as modified by the employment manual. The employee who knows about the general content of the handbook and can reference it when specific questions arise meets the requisite awareness to satisfy the standard set forth in Thompson.
Unfortunately, the majority ignores the underlying concerns Thompson sought to address and imposes an unreasonably high standard on the employee to prove justifiable reliance. Under the majority's approach, an employee must offer proof he or she has personally engaged in a detailed reading of the policies and has mastered the concepts in the policy. Thompson never contemplated such a standard.
Not only is the majority's position inconsistent with previous cases, it is also impractical given today's work environments. Employers communicate the policies contained in their employment manuals in a variety of ways including videos, general briefings, memos, and e-mails. Under the majority's approach, unless the employee personally studies the manual in detail, these methods of making the employee aware of the contents of the specific promises in the manual will not suffice. The employee must sit down and undertake a detailed reading of the policies. Such a distinction leads to ridiculous results.
Under the majority's approach, the employee who casually glances over an employee manual is not protected. Meanwhile, a coworker who has the same responsibilities and the same work arrangement but who happens to find the time and fortitude to comb over the details of the manual can find protection in it. For example, in this case, the majority distinguishes Bulman's situation from that of his secretary, Darlene. Bulman testified that Safeway's policy manuals were in one of his files and that he was generally aware of the contents, but he relied on Darlene to look up the details of certain policies in the manual when he needed to refer to them specifically. The majority makes light of this, remarking, "[h]owever, even assuming that she had the requisite understanding, `Darlene' is not the one suing upon a claim of having justifiably relied upon Safeway's employment of relatives policy." Majority at 1177. With this comment, the majority seems to suggest that Darlene could prove justifiable reliance, while Bulman could not. However, the only difference is Darlene actually physically pulled out the manuals and looked up the policies (under Bulman's direction), while Bulman relied on his support staff to physically reference the handbook and provide the information to him. I fail to understand how one person is more aware of Safeway's policy than the other. Certainly, under Thompson, there is no difference.
At trial, the jury heard evidence that Bulman was generally familiar with Safeway's policies. While he was not familiar with the specific details of Safeway's "employment of relative policy," Bulman testified he was aware of it. Regarding the "performance management program," Bulman testified he *1185 had used it when evaluating employees. Finally, he testified he stayed on with Safeway because he believed its polices were fair and just. After hearing this testimony, the jury was then properly instructed as to the law and concluded Bulman had met his burden.
The majority takes issue with the jury verdict here, undertaking its own review of the evidence and substituting its own opinions and inferences for those of the jury. This is improper. As we have previously stated, we will overturn a jury verdict only when it is clearly unsupported by substantial evidence. Burnside v. Simpson Paper Co. 123 Wash.2d 93, 107-08, 864 P.2d 937 (1994). We have also explained how this standard is applied, stating:
"... This court will not willingly assume that the jury did not fairly and objectively consider the evidence and the contentions of the parties relative to the issues before it. The inferences to be drawn from the evidence are for the jury and not for this court. The credibility of witnesses and the weight to be given to the evidence are matters within the province of the jury and even if convinced that a wrong verdict has been rendered, the reviewing court will not substitute its judgment for that of the jury, so long as there was evidence which, if believed, would support the verdict rendered."
Burnside, 123 Wash.2d at 108, 864 P.2d 937 (citations omitted) (quoting State v. O'Connell, 83 Wash.2d 797, 839, 523 P.2d 872 (1974)). The majority seems to have lost sight of this. While the majority acknowledges the substantial evidence standard, it fails to properly apply it.
Ignoring the deference we show to the fact-finder, the majority conducts its own weighing of the evidence from the record. It degrades Bulman's credibility, characterizing his statements as "gratuitous" and "ambiguously qualified." Majority at 1177, 1178. To that end, the majority places its own emphasis on certain segments of Bulman's testimony, giving less credibility to other parts of his testimony. For example, the majority quotes the following exchange from the record adding its own emphasis:
Q. Have you seen that document before?
A. Probably have, yes.
Q. Are you familiar with Safeway's performance management program for employees?
A. Yes, with respect to rating scales and doing evaluations, yes.
Majority at 1178-79 (quoting Report of Proceedings at 36). After recharacterizing the testimony, the majority then concludes Bulman lacked awareness of the policies. However, I believe the jury could have placed emphasis elsewhere and reasonably concluded Bulman was a credible witness and he had been aware of Safeway's policies before his termination. For example, perhaps the jury heard the testimony with the following emphasis:
Q. Have you seen that document before?
A. Probably have, yes.

Q. Are you familiar with Safeway's performance management program for employees?
A. Yes, with respect to rating scales and doing evaluations, yes.
Based on Bulman's actual testimony, the jury could have placed the emphasis here as opposed to where the majority places its emphasis. The problem we encounter here is that this court cannot evaluate the body language, the tone of voice, or the amount of eye contact of the witness from the written record. All these things are relevant to weighing a witness' credibility and to drawing inferences from that testimony. That is precisely why we defer to the jurythe jury members are eyewitnesses to the testimony and can evaluate the intangibles that cannot be preserved accurately through the written record.
It is not our position to substitute the inferences we draw from the evidence and our determination of the credibility of the witness for that of the jury. The Court of Appeals understood this and, while it felt the "question may be a close one," it found enough evidence was before the jury for it to draw a reasonable inference that Bulman was aware of Safeway's policies and justifiably relied on them. Bulman v. Safeway, Inc., 96 Wash.App. 194, 207-08, 978 P.2d 568 (1999). The majority is harsh in its criticism of the Court of Appeals. Yet, the Court of *1186 Appeals undertook a proper review of the record, while the majority does not.
The jury verdict in this case should be upheld. While the majority may not particularly like the inferences the jury drew or the outcome of the case, we should not simply overturn a properly instructed jury verdict, which is supported by the evidence.
SMITH and SANDERS, JJ., concur.
NOTES
[1] See Bulman v. Safeway, Inc., 96 Wash.App. 194, 978 P.2d 568 (1999).
[2] The dissent conveniently ignores this test, which thoroughly undermines its analysis.
[3] As did the Court of Appeals, see Bulman, 96 Wash.App. at 205, 978 P.2d 568, the dissent would dismiss this critical passage as dicta, arguing that "[t]he issue of justifiable reliance was not central to our holding in Stewart.... Our comment in Stewart regarding justifiable reliance offers no guidance in this case." Dissent at 1183. However, our holding in Stewart had two partseither of which could have been dispositive: "We conclude that Chevron's layoff policy was not part of Stewart's employment contract as the layoff policy was not a specific promise, and the policy was not relied on by Stewart." Stewart, 111 Wash.2d at 614, 762 P.2d 1143 (emphasis added); see also id. at 615, 762 P.2d 1143 ("The majority holds that a layoff provision... did not constitute a promise of treatment in a specific situation, nor was it relied upon by Stewart." (Dore, J., dissenting)). Indeed, the fact that the employee had not even relied upon the policy at issue could be viewed as the resolution of the case.
[4] Contrary to the dissent's assertions, our later reliance in Swanson upon the justifiable reliance language from Stewart effectively renders moot the question of whether it was dicta. The dissent clearly ignores our earlier characterization, in Swanson, of the Stewart holding: "The court concluded that these terms lacked the specificity necessary to create a binding promise. Further, the employee conceded that he was not aware of the layoff policy until after he was discharged, and therefore, the court concluded, he could not have relied upon the policy." Swanson, 118 Wash.2d at 521-22, 826 P.2d 664 (emphasis added) (citing Stewart, 111 Wash.2d at 613-14, 762 P.2d 1143).
[5] Clearly it would be breaking new ground to find that in a contract between two parties (i.e., employer and employee), a third party's awareness of a contractual promise remedies the lack of awareness on the part of the party seeking to enforce that promise.
[6] Here the Court of Appeals refers to Bulman's testimony that came in response to the question, "Generally how did you feel about the fairness or evenhandedness of Safeway's policies?" RP (July 9, 1997) at 19 (emphasis added); see also Bulman, 96 Wash.App. at 207, 978 P.2d 568. This is a clearly insufficient basis for a finding of justifiable reliance. Neither the question nor its answer was at all policy specific. See id.
[7] The dissent here concurs with the Court of Appeals, fearing that employees will be required to personally study employment manuals in detail, as if that level of awareness of one's employment rights were undesirable, and that alternative means of making them "aware of the contents of the specific promises in the manual will not suffice." Dissent at 1184. We are not prescribing here a preferred means of becoming aware enough of employment policies to justifiably rely upon them, although certainly that awareness is not established, as the dissent would find, solely by the mere knowledge of the existence of a manual containing specific promises of specific treatment in specific circumstances. See Dissent at 1184. Rather than inventing new law, as the dissent accuses us of, we are simply affirming precedent stating there could not "be an enforceable promise of specific treatment in specific circumstances because there could be no justifiable reliance where the employee did not know about the `promise' until after he was discharged." Swanson, 118 Wash.2d at 522, 826 P.2d 664 (citing Stewart, 111 Wash.2d 609, 762 P.2d 1143). Compare Dissent at 1182 ("Our cases do not suggest an employee must be specifically aware of the details of the particular promises contained in the manual.").